# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
September 30, 2015 Session Heard at Lebanon[1]

## PERVIS TYRONE PAYNE v. STATE OF TENNESSEE

**Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. P-09594     J. Robert Carter, Jr., Judge**

---

**No. W2013-01248-SC-R11-PD – Filed April 7, 2016**

---

We granted permission to appeal in this case to determine whether a capital defendant, via a petition for writ of error coram nobis, may obtain a hearing to determine whether he is ineligible to be executed because he is intellectually disabled. The Petitioner, Pervis Tyrone Payne, was convicted in 1988 of two first degree murders, and the jury imposed the death sentence for each murder. In 2001, this Court held that the federal and state constitutions prohibit the execution of individuals who are intellectually disabled. Van Tran v. State, 66 S.W.3d 790, 812 (Tenn. 2001). The Petitioner asserts that he meets the statutory definition of intellectually disabled, but he has not yet been afforded an evidentiary hearing on his claim. In this proceeding, he has sought to establish his right to such a hearing via a claim of error coram nobis. The trial court denied relief without a hearing, and the Court of Criminal Appeals affirmed with one judge dissenting. We hold that the Petitioner is not entitled to relief under a claim of error coram nobis. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

### Tenn. R. App. P. 11; Judgment of the
### Court of Criminal Appeals Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK and HOLLY KIRBY, JJ., joined.

Paul R. Bottei and Christopher M. Minton, Nashville, Tennessee, for the appellant, Pervis Tyrone Payne.

---

[1] We heard oral argument in this case on September 30, 2015, at Cumberland University in Lebanon, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Nicholas W. Spangler, Assistant Attorney General; Amy Weirich, District Attorney General; and Thomas D. Henderson, Assistant District Attorney, for the appellee, the State of Tennessee.

## OPINION

### Factual and Procedural History

This matter began in 1987 when the Petitioner stabbed to death Charisse Christopher and her minor daughter, Lacie. He also stabbed Ms. Christopher's minor son, Nicholas. In 1988, a jury convicted the Petitioner of two counts of first degree murder and one count of assault with intent to commit first degree murder. The jury imposed a death sentence for each of the two murders, and the trial court imposed a sentence of thirty years for the attempted murder. This Court affirmed the Petitioner's convictions and sentences in 1990, see State v. Payne, 791 S.W.2d 10, 21 (Tenn. 1990), and the United States Supreme Court affirmed, see Payne v. Tennessee, 501 U.S. 808, 830 (1991).

The Petitioner since has pursued collateral review but has been unsuccessful in obtaining the reversal of either his convictions or his sentences. See Payne v. State, No. 02C01-9703-CR-00131, 1998 WL 12670, at *21 (Tenn. Crim. App. Jan. 15, 1998) (denying post-conviction and error coram nobis relief), perm. appeal denied (Tenn. June 8, 1998); Payne v. Bell, 418 F.3d 644, 646 (6th Cir. 2005) (denying habeas corpus relief), cert. denied 548 U.S. 908 (2006); Payne v. State, No. W2007-01096-CCA-R3-PD, 2007 WL 4258178, at *1 (Tenn. Crim. App. Dec. 5, 2007) (denying motion to compel testing of evidence under the Post-Conviction DNA Analysis Act of 2001), perm. appeal denied (Tenn. Apr. 14, 2008).

In 1990, the Tennessee General Assembly passed legislation providing that, "[n]otwithstanding any law to the contrary, no defendant with [an intellectual disability] at the time of committing first degree murder shall be sentenced to death." 1990 Tenn. Pub. Acts 730, ch. 1038, § 1, codified at Tenn. Code Ann. § 39-13-203(b) (2014).[2] The legislation defined intellectual disability as follows:

> (1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;

---

[2] The legislation, which originally used the term "mental retardation," was revised in 2010 to utilize the term "intellectual disability." See 2010 Tenn. Pub. Acts 166, ch 734, §§ 1-3, 7.

(2) Deficits in adaptive behavior; and

(3) The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a) ("the intellectual disability statute"). Subsequently, in 2001, this Court determined that the federal and state constitutions prohibit the execution of persons who are intellectually disabled. See Van Tran v. State, 66 S.W.3d 790, 812 (Tenn. 2001). Shortly thereafter, the United States Supreme Court declared that the federal constitution prohibited the execution of the intellectually disabled. See Atkins v. Virginia, 536 U.S. 304, 321 (2002).

The instant collateral proceeding began on April 4, 2012, when the Petitioner filed a motion to reopen his petition for post-conviction relief ("Motion to Reopen") in an effort to obtain a hearing on his claim that he meets the definition of intellectually disabled as set forth in the intellectual disability statute.[3] The Petitioner attached to the Motion to Reopen the March 20, 2012, affidavit of Dr. Daniel J. Reschly, a professor of education and psychology at Vanderbilt University. According to Dr. Reschly, the Petitioner was administered the Otis-Lenon Test of Mental Ability, a group-administered I.Q. test, in March 1976, when the Petitioner was nine years old, and he received an I.Q. score of 69. In 1987, the Petitioner was administered the Wechsler Adult Intelligence Scale-Revised ("WAIS-R") and received a full-scale I.Q. score of 78. In 1996, he was administered the WAIS-R and received a full-scale I.Q. score of 78. In 2010, he was administered the fourth edition of the Wechsler Adult Intelligence Scale ("WAIS-IV") and received a full-scale I.Q. score of 74. Dr. Reschly applied the Flynn Effect[4] to adjust

---

[3] In Van Tran, this Court held that those defendants who had been sentenced to death prior to the decision could raise a claim of intellectual disability in a motion to reopen a previously filed petition for post-conviction relief. 66 S.W.3d at 811-12; see also Keen v. State, 398 S.W.3d 594, 607-08 (Tenn. 2012); Howell v. State, 151 S.W.3d 450, 463 (Tenn. 2004). The Petitioner did not file a motion to reopen within one year of the ruling in Van Tran, the statutory time limit. See Tenn. Code Ann. § 40-30-117(a)(1) (providing that motions to reopen based on new and retroactive constitutional rights must be filed within one year of the highest appellate court's ruling establishing the right).

[4] As we have explained previously,

The "Flynn effect" is the name given to the verified worldwide phenomenon that I.Q. scores, since the beginning of intelligence testing, have tended to rise overall at a rate of 0.3 per year, or three points every decade. . . . To compensate for the Flynn effect, I.Q. tests have to be routinely revised or "renormed" to make them more difficult. Thus, the WAIS gave way to the WAIS-R, which was eventually replaced by the WAIS-III, and now the current WAIS-IV. Under the Flynn effect, a recently-obtained WAIS-IV score will be close to accurate, while a WAIS-III score that was obtained ten years after the test

the Petitioner's I.Q. scores and stated that the adjusted scores on his latter three tests were 75.4, 72.4, and 73.7. Dr. Reschly also stated that, based upon his clinical judgment and consideration of the Flynn Effect, estimation of error in the test, the practice effect,[5] and cultural differences, the Petitioner's "functional intelligence clearly is at or below 70." Dr. Reschly further concluded that the Petitioner has significant deficits in adaptive behavior due to substantial limitations in the conceptual skills and practical skills domain. In Dr. Reschly's opinion, the Petitioner's functional intelligence and significant deficits in adaptive behavior were present prior to the age of eighteen. In sum, Dr. Reschly opined that the Petitioner is intellectually disabled within the meaning of the intellectual disability statute.[6]

As grounds for the Motion to Reopen, the Petitioner asserted that this Court's decision in Coleman v. State, 341 S.W.3d 221 (Tenn. 2011), established "a new retroactive constitutional right not recognized at the time of trial." See Tenn. Code Ann. § 40-30-117(a)(1) (2012) (providing that a post-conviction petitioner may move to reopen his petition if "[t]he claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required").[7] The Petitioner

---

was renormed would need to be reduced by approximately three points to capture the test-taker's actual I.Q. at the time.

Keen v. State, 398 S.W.3d 594, 605 n.11 (Tenn. 2012) (citing Geraldine W. Young, A More Intelligent and Just Atkins: Adjusting for the Flynn Effect in Capital Determinations of Mental Retardation or Intellectual Disability, 65 Vand. L. Rev. 615, 616, 621, 624-25 (2012); Am. Ass'n on Intellectual and Developmental Disabilities, Intellectual Disability: Definition, Classification, and Systems of Supports 37 (11th ed. 2010) (hereafter AAIDD Manual); James R. Flynn, Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect, 12 Psychol. Pub. Pol'y & L. 170, 173-74, 179-81 (2006)).

[5] "The practice effect refers to increases in I.Q. test scores that result from a person's being retested using the same or a similar instrument." Coleman v. State, 341 S.W.3d 221, 242 n.55 (Tenn. 2011) (citing AAIID Manual, at 38).

[6] The Petitioner has never had an evidentiary hearing on his claim that he is intellectually disabled as that term is defined in the intellectual disability statute. Therefore, his repeated assertions to this Court that the evidence of his intellectual disability is "uncontroverted" are inaccurate.

[7] Prior to our decision in Coleman, both trial courts and the Court of Criminal Appeals had construed our earlier decision in Howell v. State, 151 S.W.3d 450 (Tenn. 2004), as establishing

a mandatory requirement that only raw I.Q. test scores may be used to determine whether a criminal defendant has "significantly impaired general intellectual functioning" and that a raw I.Q. test score above seventy (70) may be sufficient, by itself, to disprove a criminal defendant's claim that he or she is a person with intellectual disability.

asserted as an additional basis for granting the Motion to Reopen that Dr. Reschly's opinion was new scientific evidence establishing that "he is actually innocent of capital murder and the death penalty." See id. § 40-30-117(a)(2) (providing that a post-conviction petitioner may move to reopen his petition if the motion is "based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted").

After the Petitioner filed the Motion to Reopen but before the trial court ruled on it, this Court issued its decision in Keen v. State, 398 S.W.3d 594 (2012), in which we concluded that Coleman did not provide a basis for reopening a post-conviction proceeding in order to assess a capital defendant's claim of intellectual disability. Keen, 398 S.W.3d at 609, 613. We also held in Keen that a capital defendant's intellectual disability does not render him actually innocent of the death penalty offense. Id. at 612-13.

Realizing the roadblock that Keen erected to his Motion to Reopen, the Petitioner filed his "Amended Petition for Relief from Death Sentences" only days after Keen was released. In the Amended Petition, the Petitioner asserts that he is seeking relief (1) pursuant to our error coram nobis statute, Tenn. Code Ann. § 40-26-105, and (2) "by directly invoking [the intellectual disability statute] as an additional basis for this Court to adjudicate his mental retardation/intellectual disability claim and vacate his death sentences."

The State filed a written response, requesting that the trial court deny both the Motion to Reopen and the Amended Petition without a hearing.

The trial court denied both the Motion to Reopen and the Amended Petition without a hearing. As to the Motion to Reopen, the trial court noted that Keen held that Coleman did not establish a new constitutional right. Accordingly, the Petitioner was not entitled to reopen his petition for post-conviction relief on that basis. The trial court also noted that Keen held that new proof of intellectual disability does not establish the type of innocence referred to in Tennessee Code Annotated section 40-30-117(a)(2). Accordingly, the Petitioner was not entitled to reopen his petition for post-conviction relief pursuant to that subsection. The trial court further noted that, while the Van Tran decision established a new constitutional right that was to be applied retroactively, see

Coleman, 341 S.W.3d at 240. In Coleman, this Court clarified that a trial court "may receive and consider *any* relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below," id. at 241 (emphasis added), including expert opinions that utilize various recognized factors for adjusting raw I.Q. scores upwards or downwards, id. at 242, 242 n.55.

5

Van Tran, 66 S.W.3d at 811, the Petitioner's Motion to Reopen was filed more than one year after the Van Tran decision was released and therefore was barred by the applicable statute of limitations. See Tenn. Code Ann. § 40-30-117(a)(1) (providing that motions to reopen based on new and retroactive constitutional rights must be filed within one year of the highest appellate court's ruling establishing the right). The Court of Criminal Appeals denied the Petitioner's application for permission to appeal the trial court's denial of his Motion to Reopen, and this Court denied the Petitioner's application for permission to appeal the Court of Criminal Appeals' ruling. Accordingly, the trial court's disposition of the Petitioner's Motion to Reopen is not before us.

As to the Petitioner's claim of error coram nobis, the trial court denied relief on the basis that the claim was barred by the applicable one year statute of limitations. See Tenn. Code Ann. §§ 40-26-105(a) (2012); 27-7-103 (2000). The trial court did not address the Petitioner's claim that the intellectual disability statute created a free-standing cause of action.

On appeal, the majority of the Court of Criminal Appeals panel affirmed the trial court's denial of relief on the Petitioner's claim of error coram nobis and also held that the intellectual disability statute did not afford the Petitioner an independent cause of action. See Payne v. State, No. W2013-01248-CCA-R3-PD, 2014 WL 5502365, at *17 (Tenn. Crim. App. Oct. 30, 2014). In a separate opinion, Judge McMullen concluded that the Petitioner should be afforded an evidentiary hearing in which to have determined his claim of intellectual disability and concomitant ineligibility for execution. Id. (McMullen, J., concurring in part, dissenting in part). We granted the Petitioner's application for permission to appeal.

## Analysis

*Error Coram Nobis*

The Petitioner is seeking a hearing on his claim of intellectual disability through the procedural mechanism of error coram nobis relief. Our statute setting forth the parameters for seeking a writ of error coram nobis provides as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to

6

matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(b). The decision to grant or deny a petition for writ of error coram nobis on its merits rests within the trial court's sound discretion. Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010).

Claims under the coram nobis statute are subject to a one-year statute of limitations. Tenn. Code Ann. § 27-7-103. "The statute of limitations is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." Harris, 301 S.W.3d at 144 (citing State v. Mixon, 983 S.W.2d 661, 670 (Tenn. 1999)). The trial court in this proceeding denied the Petitioner relief under the coram nobis statute on the basis that his claim was barred by this statute of limitations.

We have opined that the writ of error coram nobis "is an *extraordinary* procedural remedy . . . [that] fills only a slight gap into which few cases fall." Mixon, 983 S.W.2d at 672. That slight gap is met only under the following circumstances:

> The . . . petition must be in writing and (1) must describe with particularity the nature and substance of the newly discovered evidence and (2) must demonstrate that this evidence qualifies as "newly discovered evidence." In order to be considered "newly discovered evidence," the proffered evidence must be (a) evidence of facts existing, but not yet ascertained, at the time of the original trial, (b) admissible, and (c) credible. In addition to describing the form and substance of the evidence and demonstrating that it qualifies as "newly discovered evidence," the [petitioner] must also demonstrate with particularity (3) why the newly discovered evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence; and (4) how the newly discovered evidence, had it been admitted at trial, may have resulted in a different judgment.

Harris, 301 S.W.3d at 152 (Koch, J., concurring in part and concurring in result) (footnotes omitted). These prerequisites make clear that the focus of a proper petition for writ of error coram nobis is on the *facts* that should have been made available to the fact-finder *at the time of the trial*. See State ex rel. Carlson v. State, 407 S.W.2d 165, 167 (Tenn. 1966) (stating that the purpose of a coram nobis proceeding "is to bring to the

7

attention of the court some *fact* unknown to the court, which if known would have resulted in a different judgment") (emphasis added).

As this Court explained almost twenty years ago, "the common law writ of error coram nobis allowed a trial court to reopen and correct its judgment upon discovery of a substantial *factual* error not appearing in the record which, if known at the time of judgment, would have prevented the judgment from being pronounced." Mixon, 983 S.W.2d at 667 (citing John S. Gillig, Kentucky Post-Conviction Remedies and the Judicial Development of Kentucky Rule of Criminal Procedure 11.42, 83 Ky. L. J. 265, 320 (1994-95)) (emphasis added). This concern with factual error was incorporated into the coram nobis statute:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Id. at 668 (quoting Tenn. Code Ann. § 40-26-105 (1997 Repl.)).

Significantly, the relief being sought via a writ of error coram nobis "is the setting aside of the judgment of conviction and the granting of a new trial." Harris, 301 S.W.3d at 150 n.8 (Koch, J., concurring in part and concurring in result) (citing Tenn. Code Ann. § 40-26-105(c)). As this Court previously has recognized, the writ of error coram nobis may provide a remedy "for those rare instances in which a petitioner may otherwise be wrongfully convicted of a crime." Wlodarz v. State, 361 S.W.3d 490, 504 (Tenn. 2012). Thus, the goal of the relief afforded under a writ of error coram nobis is a reliable determination of the petitioner's criminal liability for the offense with which he was charged based on all of the evidence that should have been made available to the fact-finder at the initial trial. The goal is *not* a redetermination of the petitioner's criminal liability in the face of changes in the law occurring many years after his trial.

In the realm of coram nobis jurisprudence, "newly discovered evidence" refers to evidence that existed at the time of trial but of which the defendant, through no fault of his own, was unaware. See Tenn. Code Ann. § 40-26-105(b); Harris, 301 S.W.3d at 152 (Koch, J., concurring in part and concurring in result). As the Court of Criminal Appeals has recognized, however, "a narrow exception exists where 'although not newly discovered evidence, in the usual sense of the term, the *availability* of the evidence is newly discovered.'" Sims v. State, No. W2014-00166-CCA-R3-PD, 2014 WL 7334202, at *9 (Tenn. Crim. App. Dec. 23, 2014) (quoting Harris, 301 S.W.3d at 160-61 (Koch, J.,

8

concurring in part and concurring in result) (internal quotation marks omitted)).  This narrow exception may be triggered when previously unavailable evidence becomes available following a change in *factual* circumstances.  Id.  Thus, where testimony that was not available at the time of trial later becomes available, the testimony may qualify as "newly discovered" even if the defendant knew about the witnesses at the time of trial.  See, e.g., Taylor v. State, 171 S.W.2d 403, 404-05 (Tenn. 1943) (applying exception in motion for new trial where one witness was hospitalized and one witness was outside the jurisdiction at the time of trial but who later became available to testify); Brunelle v. State, No. E2010-00662-CCA-R3-PC, 2011 WL 2436545, at *10 (Tenn. Crim. App. June 16, 2011) (noting that petitioner could have sought coram nobis relief after a Department of Children's Services report, known to the petitioner but sealed at the time of trial, became available), perm. appeal denied (Tenn. Oct. 18, 2011).  We agree with our Court of Criminal Appeals, however, that this narrow exception is not triggered by post-trial changes in the law.  Sims, 2014 WL 7334202, at *10.  Rather, "[i]ssues regarding whether a change in the law should apply post-trial relate to retroactivity and are more properly addressed in post-conviction proceedings or a motion to reopen post-conviction proceedings."  Id.

The gravamen of the Petitioner's claim in this proceeding is that he is ineligible to be executed because he is intellectually disabled.  We reiterate our commitment "to the principle that Tennessee has no business executing persons who are intellectually disabled."  Keen, 398 S.W.3d at 613.  However, we also are committed to not contorting Tennessee's statutes under the guise of construction.

The evil that the coram nobis statute is aimed at remedying is a conviction based on materially incomplete or inaccurate information.  It is not intended to provide convicted felons a second trial due to subsequent changes in the law.  Here, the Petitioner is attempting to challenge his sentence of death based on changes in the law that occurred many years after his trial.  A petition for writ of error coram nobis pursuant to Tennessee Code Annotated section 40-26-105(b) is not the appropriate procedural mechanism for pursuing the Petitioner's claim of intellectual disability.  We hold that the Petitioner has failed to state a claim that is cognizable under the coram nobis statute.  Therefore, we need not address the trial court's ruling on the statute of limitations.

The Petitioner also argues that, even if he is not entitled to relief under the coram nobis *statute*, he is entitled to a hearing under a common law claim of error coram nobis.  In this regard, the Petitioner relies on this Court's decision in Wlodarz, claiming that we stated there that coram nobis "survives as the lone means by which a court might rectify a recognized wrong when all other possible remedies are no longer available."  Wlodarz, 361 S.W.3d at 499.

The Petitioner takes our language in Wlodarz out of context. The full quote is as follows:

> In Mixon, this Court described the writ of error coram nobis, *as codified in Tennessee Code Annotated section 40-26-105(b)*, as an extraordinary procedural remedy which rarely produces results favorable to a petitioner. See Mixon, 983 S.W.2d at 673. Nevertheless, *its statutory terms* provide an alternative procedural remedy when all other post-judgment remedies fail. "'[K]nown more for its denial than its approval,'" Vasques, 221 S.W.3d at 524 (quoting Mixon, 983 S.W.2d at 666), the procedure survives as the lone means by which a court might rectify a recognized wrong when all other possible remedies are no longer available. Mixon, 983 S.W.2d at 672; see also United States v. Morgan, 346 U.S. 502, 512 . . . (1954).

Wlodarz, 361 S.W.3d at 499 (emphases added). Clearly, we were speaking about the *statutory* writ of error coram nobis, not an undefined common law procedure that guarantees the Petitioner a hearing under any circumstances. We hold that Wlodarz does not provide the Petitioner with a common law remedy in coram nobis.

The Petitioner's claim that he is ineligible to be executed because of his intellectual disability is analogous to a claim that he is not competent to be executed. In Van Tran v. State, we held that error coram nobis was not an appropriate procedural mechanism for determining a capital prisoner's competency to be executed because "[t]he writ of error coram nobis challenges the judgment itself." 6 S.W.3d 257, 264 (Tenn. 1999), abrogated in part on other grounds by State v. Irick, 320 S.W.3d 284, 294-95 (Tenn. 2010). Similarly, the Petitioner's claim of intellectual disability does not attack the validity of his sentencing proceeding as of the time it took place. Rather, and crucially, his claim of ineligibility is completely independent of the validity of his original sentencing proceeding because it arises from a change in the law that occurred many years after he was sentenced. Indeed, Justice Wade acknowledged in his dissenting opinion in Keen that he had "found no authority from this state recognizing a coram nobis petition as an appropriate procedural vehicle for asserting a claim of intellectual disability." Keen, 398 S.W.3d at 618 n.5 (Wade, J., dissenting).

The Petitioner is not entitled to relief on the basis of his proceeding in error coram nobis.

10

The Petitioner argues that this Court should construe the intellectual disability statute in such a manner as to provide him with a free-standing cause of action for seeking a ruling on his intellectual disability claim. To address this argument, we recite here the remaining provisions of the intellectual disability statute:

> (b) Notwithstanding any law to the contrary, no defendant with intellectual disability at the time of committing first degree murder shall be sentenced to death.

> (c) The burden of production and persuasion to demonstrate intellectual disability by a preponderance of the evidence is upon the defendant. The determination of whether the defendant had intellectual disability at the time of the offense of first degree murder shall be made by the court.

> (d) If the court determines that the defendant was a person with intellectual disability at the time of the offense, and if the trier of fact finds the defendant guilty of first degree murder, and if the district attorney general has filed notice of intention to ask for the sentence of imprisonment for life without possibility of parole as provided in § 39-13-208(b), the jury shall fix the punishment in a separate sentencing proceeding to determine whether the defendant shall be sentenced to imprisonment for life without possibility of parole or imprisonment for life. The provisions of § 39-13-207 shall govern the sentencing proceeding.

> (e) If the issue of intellectual disability is raised at trial and the court determines that the defendant is not a person with intellectual disability, the defendant shall be entitled to offer evidence to the trier of fact of diminished intellectual capacity as a mitigating circumstance pursuant to § 39-13-204(j)(8).

> (f) The determination by the trier of fact that the defendant does not have intellectual disability shall not be appealable by interlocutory appeal, but may be a basis of appeal by either the state or defendant following the sentencing stage of the trial.

Tenn. Code Ann. § 39-13-203.

11

While the Petitioner acknowledges that the statute does not contain an explicit provision allowing him to seek an evidentiary hearing, he nevertheless contends that the statute allows this Court to infer such a provision. The State disagrees.

The trial court did not rule on this aspect of the Petitioner's application for relief. The Court of Criminal Appeals rejected the Petitioner's argument, holding that

> [t]he plain language of the statute does not create an independent cause of action allowing a defendant to challenge his or her eligibility for the death penalty. Had the General Assembly intended to create a separate and independent cause of action in which to allege intellectual disability, they would have stated so in the statute.

Payne, 2014 WL 5502365, at *17.

In Van Tran, this Court concluded that the intellectual disability statute was to be given prospective application, only. 66 S.W.3d at 797-99. We also recognized that the intellectual disability statute "does not contain a procedure by which [intellectually disabled] persons sentenced to death before July 1, 1990, can raise [their intellectual disability] as a bar to execution." Id. at 798. We concluded that a defendant who had been sentenced to death prior to the effective date of the intellectual disability statute could move to reopen a previously filed post-conviction petition on the basis of the new and retroactive *constitutional* ruling that we issued in the Van Tran decision. See id. at 811-12.

Consistently with our decision in Van Tran, we hold that the intellectual disability statute does not create an independent collateral cause of action for raising a claim of intellectual disability and ineligibility to be executed. The plain language of the statute indicates that it is not applicable to those defendants who were sentenced to death prior to its enactment because it prohibits those defendants who meet the definition of intellectual disability from being "*sentenced* to death," not from being executed. Tenn. Code Ann. § 39-13-203(b). The remaining provisions of the intellectual disability statute also lead to the inescapable conclusion that the legislature intended a claim of intellectual disability to be raised in conjunction with the capital defendant's *trial*, not in a collateral proceeding many years later. For instance, subsection (d) refers to how the sentencing proceeding shall be conducted if, prior thereto, the trial court has determined that the defendant was intellectually disabled at the time he committed the murder and the fact-finder then concludes that the defendant is guilty of first degree murder. Subsection (e) addresses the situation in which the trial court concludes pre-trial that the defendant is not intellectually disabled. In that event, the defendant is permitted to offer proof of his mental capacities "as a mitigating circumstance" during the sentencing hearing. Tenn. Code Ann. § 39-13-

12

203(e). Additionally, subsection (f) prohibits a defendant from seeking an interlocutory appeal of a trial court's determination that he is not intellectually disabled, providing instead that the issue may be raised on appeal "following the sentencing stage of the trial." Id. § 39-13-203(f). These provisions make clear the legislature's intention that a claim of intellectual disability be resolved *before* the defendant is either tried or sentenced. Accordingly, these provisions indicate that our legislature did not intend the intellectual disability statute to provide a private right of action to a capital defendant who was convicted and sentenced to death prior to the statute's enactment.

The Petitioner has failed to establish that he has a private cause of action to pursue his claim of intellectual disability pursuant to the intellectual disability statute. Accordingly, the Petitioner is not entitled to relief on this basis.

*Other Potential Remedies*

In conjunction with granting the Petitioner's application for permission to appeal, this Court requested the parties to address whether the United States Supreme Court's recent decision in Hall v. Florida, 572 U.S. __, 134 S. Ct. 1986 (2014), is to be afforded retroactive application to cases on collateral review. We also asked the parties to address the issue of the appropriate procedural avenue for the Petitioner to pursue, if any, should we conclude that he is not entitled to an evidentiary hearing via his claim of error coram nobis.

Although the Petitioner acknowledges that the trial court's denial of his Motion to Reopen is not before this Court, he argues that recent changes in the law should allow him to reopen his post-conviction proceeding. Specifically, he asks us to hold that the United States Supreme Court's opinion in Hall established a new constitutional right that must be applied retroactively.[8] He also asks us to overrule our decision in Keen and hold that our decision in Coleman created a new constitutional right that requires retrospective application. In support of this latter contention, the Petitioner relies on a recent decision by the United States Court of Appeals for the Sixth Circuit, Van Tran v. Colson, 764 F.3d 594 (6th Cir. 2014). We will address each of these arguments in turn.[9]

---

[8] Although the Petitioner argues to this Court that Hall established a new constitutional rule that must be afforded retroactive application, the record contains no indication that the Petitioner filed a motion to reopen his post-conviction petition within one year of that decision.

[9] The Petitioner also posits that he should be allowed to seek relief via a declaratory judgment action, a motion to vacate an illegal sentence, and/or a petition for writ of *audita querela*. We decline to address the Petitioner's contentions regarding these actions, none of which, so far as the record before us indicates, the Petitioner has pursued.

13

Hall v. Florida

The Petitioner claims in his brief to this Court that Hall holds that he is *entitled to a hearing* on his claim of intellectual disability because, after applying the standard error of measurement to his I.Q. test scores, he has at least one score that falls below 71. We disagree that Hall holds that the Petitioner is entitled to a hearing.

In Hall, the Supreme Court considered the Florida Supreme Court's interpretation of its state statute prohibiting the execution of intellectually disabled defendants. The Florida statute defined intellectual disability as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." Hall, 134 S. Ct. at 1994 (quoting Fla. Stat. Ann. § 921.137(1) (2013)). The statute defined the term "significantly subaverage general intellectual functioning" as "performance that is two or more standard deviations from the mean score on a standardized intelligence test." Id. Florida's high court had decided that, unless a defendant could adduce proof that he had a raw score of less than 71 points on an I.Q. test, regardless of the standard error of measurement, the defendant was barred from adducing other proof of his intellectual disability. Id. at 1995. It was this line of decisions and statutory interpretation that the United States Supreme Court overruled. See also Brumfield v. Cain, __ U.S. __, __, 135 S. Ct. 2269, 2277-78 (2015) (emphasizing that the determination of a capital defendant's functional I.Q. must take into account the standard error of measurement applicable to the defendant's raw I.Q. test scores).

In Hall, the United States Supreme Court held as follows:

[W]hen a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.

. . . .

The Florida statute, as interpreted by its courts, misuses IQ score on its own terms; and this, in turn, bars consideration of evidence that must be considered in determining whether a defendant in a capital case has intellectual disability. Florida's rule is invalid under the Constitution's Cruel and Unusual Punishments Clause.

Hall, 134 S. Ct. at 2001.

14

At no point in Hall did the Supreme Court address the circumstances under which the defendant was entitled to the hearing. Rather, the issue before the Court was the type of evidence which the defendant was entitled to offer at the hearing otherwise provided.[10] Thus, Hall does not address by what procedural avenue the Petitioner in this case might be afforded a hearing on his claim of intellectual disability. Hall does *not* stand for the proposition that the Petitioner *is* entitled to a hearing under the facts and procedural posture of this matter.

Moreover, even if Hall held that a condemned inmate must be afforded a hearing on a collateral claim that he is intellectually disabled, the decision would benefit the Petitioner only if it applied retroactively. However, the United States Supreme Court has not ruled that Hall is to be applied retroactively to cases on collateral review. The United States Courts of Appeal for the Eighth and Eleventh Circuits have concluded that Hall does *not* apply retroactively to cases on collateral review. See Goodwin v. Steele, Nos. 14-3739, 14-3743, 2014 WL 11128597, at *2 (8th Cir. Dec. 9, 2014) (per curiam); In re Henry, 757 F.3d 1151, 1159-61 (11th Cir. 2014). The Petitioner has cited us to no federal appellate decision holding that Hall must be applied retroactively to cases on collateral review. We decline to hold that Hall applies retroactively within the meaning of Tennessee Code Annotated section 40-30-117(a)(1).

## Coleman v. State and Van Tran v. Colson

As set forth above, the constitutional prohibitions against executing the intellectually disabled did not arise until after the Petitioner was convicted and sentenced. The Petitioner's first opportunity for seeking to avoid the death penalty on this basis arose in 2001 with our decision in Van Tran v. State. The Petitioner, however, did not seek relief on this basis at that time.

In 2004, this Court issued its decision in Howell v. State, 151 S.W.3d 450 (Tenn. 2004). As indicated above, some trial courts and Court of Criminal Appeals panels applied Howell in such a way as to preclude relief if a defendant alleging intellectual disability could not produce a raw I.Q. score of less than 71. While the Petitioner contends that a motion to reopen his post-conviction petition would have been futile after Howell, he does not offer a satisfactory explanation for his failure to file such a motion within a year after our decision in Van Tran, which preceded Howell by more than two years. Our review of Dr. Reschly's affidavit, which includes his curriculum vitae,

---

[10] Hall indicates that the defendant obtained a hearing after filing a motion in 2004 "claiming that he had intellectual disability and could not be executed." Hall, 134 S. Ct. at 1991-92. The decision does not describe the procedural mechanism underlying the motion. The defendant originally had been sentenced to death prior to July 1981 and, after that sentence was vacated, he was resentenced to death sometime between 1989 and 1993. See Hall v. State, 614 So. 2d 473, 475 (Fla. 1993).

indicates that he was practicing at Vanderbilt in 2001 and 2002 and, presumably, would have been available to provide substantially the same information then that he has provided now. In short, had the Petitioner pursued his claim of intellectual disability at the appropriate time, he would not have faced the potential of the trial (or intermediate appellate) court relying on Howell to limit his proof.

The Petitioner contends that the progression of the law in this area presented him with another opportunity to reopen his petition for post-conviction relief when this Court decided Coleman. As set forth above, this Court already has concluded that Coleman did not create a new constitutional rule that must be applied retroactively. See Keen, 398 S.W.3d at 609. However, in Colson, the federal court of appeals determined that Coleman was to be applied retroactively to the defendant's claim of intellectual disability. 764 F.3d at 617. The Petitioner asks us to reverse our decision in Keen on the basis of Colson.

In Colson, the United States Court of Appeals for the Sixth Circuit considered whether the defendant was entitled to federal habeas corpus relief on his claim that he was intellectually disabled. Id. at 597. The defendant had been given a hearing in state court prior to this Court's decision in Coleman, and the trial court concluded that the defendant had not proved his intellectual disability. Id. at 600. The state trial court therefore denied relief, and the Court of Criminal Appeals affirmed. Id. at 601.

Upon his petition for habeas corpus relief in federal court, the district court denied relief. Id. at 602. On appeal, the United States Court of Appeals for the Sixth Circuit remanded "for the entry of a conditional writ of habeas corpus to allow the state courts to consider Van Tran's Atkins claim under the proper, now-governing standard" announced in Coleman. Id. at 597. That is, the federal appeals court concluded that Coleman was to be applied retroactively. Id. at 617. In so concluding, the Colson court relied on its earlier decision in Black v. Bell, 664 F.3d 81 (6th Cir. 2011). Id. at 617. In Black, the federal appellate court explained that "federal courts conducting habeas review routinely look to state law that has been issued after the defendant's state conviction has become final in order to determine how Atkins applied to the specific case at hand." Black, 664 F.3d at 92 (citing Hill v. Anderson, 300 F.3d 679, 682 (6th Cir. 2002); Wiley v. Epps, 625 F.3d 199, 208 (5th Cir. 2010)).

Neither Colson nor Black is binding on this Court. See Frye v. Blue Ridge Neuroscience Ctr, P.C., 70 S.W.3d 710, 716 (Tenn. 2002) (recognizing that "the decisions of the Sixth Circuit are not binding on" the Tennessee Supreme Court); Townes v. Sunbeam Oster Co., Inc., 50 S.W.3d 446, 452 (Tenn. Ct. App. 2001) (acknowledging that the Sixth Circuit's "interpretation and application of state law is not binding on" the Tennessee Court of Appeals). The precise issue the Petitioner asks us to consider is

whether our decision in <u>Coleman</u> provides him with grounds to reopen his state law petition for post-conviction relief. That issue is a matter of state law. Neither <u>Colson</u> nor <u>Black</u> persuades us that our decision in <u>Keen</u>—that <u>Coleman</u> "did not establish a new rule of constitutional law that must be applied retroactively" so as to support motions to reopen petitions for post-conviction relief—was incorrect. <u>Keen</u>, 398 S.W.3d at 597. Accordingly, we decline to overrule our decision in <u>Keen</u>.

## Conclusion

Our decision in this case does not foreclose the Petitioner from availing himself of any and all state and federal remedies still available to him. <u>See</u> <u>Keen</u>, 398 S.W.3d at 613. We reaffirm the holding in <u>Van Tran</u> that such claims may be raised in Tennessee courts by a timely filed motion to reopen. <u>Van Tran</u>, 66 S.W.3d at 811-12. We recognize that some death-row inmates, like the Petitioner, may have failed to timely file a motion to reopen on this basis. We encourage the General Assembly to consider whether another appropriate procedure should be enacted to enable defendants condemned to death prior to the enactment of the intellectual disability statute to seek a determination of their eligibility to be executed. We hold, however, that the procedural avenues by which the Petitioner is seeking relief in this proceeding do not entitle him to the hearing he seeks. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

_____
JEFFREY S. BIVINS, JUSTICE